Sarah J. Spinuzzi (Bar No. 305658)
Email: sarah@coastkeeper.org
Lauren Chase (Bar No. 324162)
Email: lauren@coastkeeper.org
ORANGE COUNTY COASTKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965

*Attorneys for Plaintiff Orange County Coastkeeper*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY COASTKEEPER, a California non-profit corporation;<br><br>          Plaintiff,<br><br>     v.<br><br>R.J. NOBLE COMPANY, a California corporation, and CARVER PROPERTIES, LLC; a California limited liability company;<br><br>          Defendants. | Civil Case No. 8:21-cv-01233<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Orange County Coastkeeper ("Coastkeeper" or "Plaintiff"), by and through counsel, hereby alleges:

## I.     JURISDICTION AND VENUE

1.     Plaintiff brings this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* (the "Clean Water Act" or the "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States). On May 11, 2021, Plaintiff issued a 60-day Notice of Violation and Intent To Sue letter (the "Notice Letter"), attached hereto as **Exhibit 1** and incorporated by reference herein, to R.J. Noble Company ("RJN") and Carver Properties,

LLC ("Carver" and, together with RJN, each a "Defendant" and collectively, "Defendants"), as the owner(s) and operator(s) of the Facility (together, the "Owner(s)" and/or "Operator(s)"). The Notice Letter informed Defendants of the violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as subsequently amended by Order 20XX-XXXX-DWQ (effective July 1,2020*) (hereinafter, the "Storm Water Permit") and the Clean Water Act at the subject industrial facility located at 15505 E. Lincoln Ave., Orange, California 92865 (the "Facility"). The Notice Letter informed Defendants of Plaintiff's intent to file suit against Defendants to enforce the Storm Water Permit and the Clean Water Act.

2.     The Notice Letter was also sent to the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Regional Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board (the "State Board"), the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region (the "Santa Ana Regional Board" or "Regional Board"), and the registered agents of each of RJN and Carver, as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

3.     Sixty (60) days have passed since the Notice Letter was sent via certified mail to Defendants and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA, USDOJ, nor the State of California have commenced or are diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

4.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are

located within this judicial district.

5.     Plaintiff seeks relief for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.     **INTRODUCTION**

6.     This complaint seeks relief for the Defendants' unlawful discharges of pollutants into waters of the United States from its industrial operations at the Facility. Specifically, the Facility discharges to Reach 2 of the Santa Ana River, which flows via Reach 1 of the Santa Ana River to the Pacific Ocean at Huntington Beach State Park (collectively, the "Receiving Waters"), in violation of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act. These violations have been occurring since at least May 20, 2016 and are ongoing and continuous.

7.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility, pour into storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and fresh surface waters each year. These surface waters, including the Receiving Waters, are ecologically sensitive areas. These waters are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species, including rare and/or threatened aquatic species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, magnesium, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, chemical oxygen demand, and other pollutants. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic-dependent wildlife. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other

contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

## III.   PARTIES

### A. Orange County Coastkeeper.

8.      Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California. Orange County Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

9.      Orange County Coastkeeper has over 1,350 members who live and/or recreate in and around the Santa Ana River, Huntington Beach State Park, and the greater Santa Ana River Watershed. Orange County Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of the Santa Ana River Watershed and all of Orange County. To further these goals, Orange County Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

10.     Members of Orange County Coastkeeper live and own homes in the Santa Ana River Watershed and use and enjoy the waters to which the Facility discharges storm water, including the Santa Ana River and its terminus at the Pacific Ocean. Members of Orange County Coastkeeper use these waterways to participate in a variety of water sports and other activities including, but not limited to, fishing, swimming, boating, kayaking, bird watching, viewing wildlife, hiking, biking, surfing, wading, standup paddle boarding, walking, running, and engaging in scientific study, including monitoring, restoration, and research activities. The discharge of pollutants from the Facility impairs each of these uses.

11.     Defendants' failure to comply with the procedural and substantive

requirements of the Storm Water Permit and/or the Clean Water Act including, but not limited to, discharges of polluted storm water from the Facility, failure to report such pollution, and failure to act in accordance with the Storm Water Permit to improve the quality of storm water discharges from the Facility, degrades water quality and harms aquatic life in the Santa Ana River and its tributaries, and impairs Orange County Coastkeeper members' use and enjoyment of those waters, giving Plaintiff standing on behalf of its members.

12. The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Storm Water Permit and the Clean Water Act. The relief sought herein will redress the harms to Plaintiff's members caused by Defendants' activities.

13. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B. The Owner(s) and/or Operator(s) of the Facility.**

14. A landowner may be liable for violations of the Clean Water Act where the owner has knowledge and control of the actions giving rise to such violations.

15. Plaintiff is informed and believes, and thereon alleges, that RJN is an owner and/or operator of the Facility.

16. Plaintiff is informed and believes, and thereon alleges, that RJN has been the owner and/or operator of the Facility since at least 2015.

17. Plaintiff is informed and believes, and thereon alleges, that RJN is an active California corporation registered and authorized to do business in California.

18. Plaintiff is informed and believes, and thereon alleges, that Jennifer Vega is the registered agent for service of process for RJN, located at 15505 E. Lincoln Ave., Orange, CA 92865.

19. Plaintiff is informed and believes, and thereon alleges, that Carver is an owner

and/or operator of the Facility.

20.    Plaintiff is informed and believes, and thereon alleges, that Carver has been an owner and/or operator of the Facility since at least 2015.

21.    Plaintiff is informed and believes, and thereon alleges, that Carver is currently an active California limited liability company registered for purposes of property management/real estate investment.

22.    Plaintiff is informed and believes, and thereon alleges, that, as of the date of the Notice Letter, Michael J. Carver was the registered agent for service of process for Carver, located at 15505 E. Lincoln Ave., Orange, CA 92865.

23.    Plaintiff is informed and believes, and thereon alleges, that Austin Carver is the current registered agent for service of process for Carver, located at 15505 E. Lincoln Ave., Orange, CA 92865.

24.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators are the responsible parties under the Clean Water Act.

25.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have violated and continue to violate the procedural and substantive terms of the Storm Water Permit including, but not limited to, the illegal discharge or pollutants from the Facility into local surface waters.

26.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators are liable for violations of the Storm Water Permit and the Clean Water Act.

## IV.    <u>LEGAL BACKGROUND</u>

### A.    The Clean Water Act.

27.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit

issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

28.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

29.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

30.     The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

31.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

32.     The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *Id.*

33.     The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

34.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

35.     A significant nexus is also established if waters that are tributary to navigable

waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

36.     Sections 505(a)(1) and 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

37.     Each Defendant is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

38.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

39.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $56,460 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after December 23, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

40.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**B.     California's Storm Water Permit.**

41.     Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

42.     Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial

storm water dischargers. *See id.*

43.  California is a state authorized by EPA to issue NPDES permits.

44.  In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

45.  The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act.

46.  The Storm Water Permit was issued on July 1, 2015 pursuant to Order No. 2014-0057-DWQ.

47.  On November 6, 2018, pursuant to Order No. 2015-0122-DWQ, the State Board amended the Storm Water Permit to incorporate Total Maximum Daily Load ("TMDL") implementation requirements for waterbodies subject to TMDLs with contributions from industrial dischargers.

48.  In order to discharge storm water to waters of the United States lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit Finding #12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* Storm Water Permit, Finding 17.

49.  Violations of the Storm Water Permit are violations of the Clean Water Act. *See* Storm Water Permit, Section XXI(A) (Duty to Comply).

50.  The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to waters of the United States. *See* Storm Water Permit, Discharge Prohibition III(B).

51.  The Storm Water Permit allows for a group of dischargers in the same industry to form a Compliance Group, with each member of the group deemed a

"Compliance Group Participant." The Compliance Group must have a registered Compliance Group Leader, who shall assist the Compliance Group Participants with compliance activities. *See* Storm Water Permit, Section XIV.

52. Compliance Group Participants, such as the Facility, remain "responsible for permit compliance for the Compliance Group Participant's facility and for ensuring that the Compliance Group Leader's activities related to the Compliance Group Participant's facility comply" with the Storm Water Permit. Storm Water Permit, Section XIV.C.1.

## C. The Storm Water Permit's Effluent Limitations.

53. The Storm Water Permit's Effluent Limitations require dischargers covered by the Storm Water Permit to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform. *See* Storm Water Permit, Section V(A).

54. Pursuant to the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); Storm Water Permit, Effluent Limitation V(A).

55. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"), which are, in part, incorporated into the Storm Water Permit via the Table 2 Numeric Action Levels ("NALs"). *See* Storm Water Permit, Monitoring, Sampling and Analysis, XI(B).

56. The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented and achieve compliance

with BAT and BCT standards. Storm Water Permit, Effluent Limitation V(A); *See* EPA's NPDES MSGP Fact Sheet at 106; *see also*, 65 Federal Register 64839 (2000).

57.     The EPA Benchmarks for the following parameters are as follows: pH – 6.0 – 9.0 standard units ("s.u."); TSS – 100 mg/L; iron – 1.0 mg/L; nitrate plus nitrate as nitrogen ("N+N") – 0.68 mg/L; O&G – 15 mg/L; chemical oxygen demand ("COD") – 120 mg/L; and aluminum – 0.75 mg/L. Additional EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facility.

58.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the facility. *Id*.

59.     Polluted discharges from asphalt and concrete mixing facilities, such as the Facility, can contain pH-affecting substances; metals, such as iron, magnesium, and aluminum; toxic metals, such as lead, zinc, nickel, cadmium, chromium, copper, arsenic, and mercury; COD, BOD; TSS; total organic carbon ("TOC"); benzene; gasoline and diesel fuels; cyanide; ammonia-N; fuel additives; paint; coolants; antifreeze; N+N; trash; indicator bacteria; and O&G. Discharges of polluted storm water to the Santa Ana River, its tributaries, and the Pacific Ocean pose threats to the public, dramatically affect the use and enjoyment of the surrounding environment, and adversely affect the aquatic environment.

**D.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements.**

60.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting, and in order to continue, industrial activities. Storm Water Permit, Sections I(J) (Finding 68), X(B). The SWPPP must meet all of the requirements of the Storm Water Permit. Storm Water Permit, Sections X(A)-(H); See also Storm Water Permit, Appendix 1. The SWPPP must identify and evaluate

sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G).

61.     The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Section I(D) (Finding 32), Section X(C).

62.     The SWPPP must include: a narrative description and summary of all industrial activity; potential sources of pollutants and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and an identification and description of individuals and their current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

63.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

64.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure accuracy, compliance with the Storm

Water Permit, and effectiveness, including effectiveness at reducing and/or eliminating pollutants at the facility. Storm Water Permit, Sections I(J) (Finding 68) and X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented, and maintained, or whether additional BMPs are needed; and, a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and XV.

**E.     The Storm Water Permit's Monitoring Implementation Program Requirements.**

65.     The Storm Water Permit requires permittees to develop and implement a storm water Monitoring Implementation Program ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. Storm Water Permit, Sections X(I) and XI.

66.     The Storm Water Permit requires facility owners and/or operators to develop and implement an adequate MIP that meets all of the requirements of the Storm Water Permit. Storm Water Permit Sections X(I) and XI(A)-XI(D).

67.     The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* Storm Water Permit, Section XI.

68.     An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility, and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *See id*.

69.     The Storm Water Permit requires facility operators to monitor, visually observe, and collect samples of storm water discharges from all locations where storm

water is discharged to ensure that the facility is complying with the terms of the Storm Water Permit. Storm Water Permit, Section XI(B).

70. Section XI(A)(1) of the Storm Water Permit requires dischargers to conduct monthly visual observations during dry weather of each drainage area. Monthly visual observations must include observations of any non-storm water discharges, all outdoor industrial equipment and activities, BMPs, and all potential sources of pollution.

71. Section XI(A)(2) of the Storm Water Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, odor in the discharge, and the source of any pollutants in storm water discharges from the facility.

72. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3).

73. Section XI(B)(1) of the Storm Water Permit defines a Qualifying Storm Event ("QSE") as a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area.

74. The Storm Water Permit requires Compliance Group Participants, such as the Facility, to collect and analyze storm water samples from at least one (1) QSE within the first half of each reporting year (July 1 to December 31) and one (1) QSE from the second half of each reporting year (January 1 to June 30). Storm Water Permit, X(B)(3) and X(G)(2).

75. Section XI(B)(6)(a)-(b) of the Storm Water Permit requires dischargers to analyze samples for TSS, O&G, and pH.

76. Section XI(B)(6)(c) of the Storm Water Permit requires dischargers to analyze samples for pollutants associated with industrial operations.

77. Section XI(B)(6)(d) of the Storm Water Permit requires dischargers to analyze samples for pollutants associated with their Standard Industrial Classification

(SIC) code.

78.    Section XI(B)(6)(e) of the Storm Water Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved TMDLs.

79.    Section XI(B)(6)(f) of the Storm Water Permit requires dischargers to analyze additional parameters required by the Regional Board.

80.    Section XI(B)(11)(a) of the Storm Water Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days of obtaining all results for each sampling event.

**F.    The Storm Water Permit's Exceedance Response Actions Requirements.**

81.    Under the Storm Water Permit, permittees are required to perform Exceedance Response Actions ("ERA") as appropriate whenever sampling indicates NAL exceedances.

82.    An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter.

83.    An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. Storm Water Permit, Section XII(A).

84.    Upon receiving NOI coverage, all permittees are deemed in "Baseline status." See Storm Water Permit, Section XII(B).

85.    A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate an NAL exceedance for that same parameter. *See* Storm Water Permit, Section XII(C).

86.    Level 1 status commences on July 1 following the reporting year during

which the exceedance(s) occurred. Storm Water Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner (a "QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See* Storm Water Permit, Section XII(C)(1)(a)-(c).

87.     Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See* Storm Water Permit, Section XII(C)(1)(c).

88.     Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 ERA Report prepared by a QISP that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* Storm Water Permit, Section XII(C)(2)(a)(i)-(ii).

89.     The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See* Storm Water Permit, Section XII(C)(2)(a)(iii).

90.     A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. Storm Water Permit, Section XII(C)(2)(b).

91.     A permittee's Level 1 status for any given parameter shall change to Level 2

status if sampling results indicate an NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. Storm Water Permit, Section XII(D).

92. A discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. Storm Water Permit, Section XII(D).

**G. The Storm Water Permit's Annual Reporting Requirements.**

93. Section XVI of the Storm Water Permit requires dischargers to submit an Annual Report to the Regional Board by July 15 of each year.

94. The Annual Report must include a Compliance Checklist that indicates whether a discharger has complied with all of the requirements of the Storm Water Permit, an explanation for any non-compliance of requirements within the reporting year, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation. *See* Storm Water Permit, Section XVI.

95. Annual Reports are certified by the legally responsible person under penalty of perjury.

**V.    FACTUAL BACKGROUND**

**A.    The Facility's Storm Water Permit Coverage.**

96. Plaintiff is informed and believes, and thereon alleges, that on or about June 30, 2015, the Facility Owners and/or Operators obtained Storm Water Permit coverage for the Facility by submitting an NOI to the State Board.

97. Plaintiff is informed and believes, and thereon alleges, the Facility's NOI identifies the operator of the Facility as RJN with an address of 15505 E Lincoln Ave.,

Orange, California 92865.

98.   The NOI lists the Facility as 97 acres in size, with all 97 acres comprised of industrial area exposed to storm water.

99.   The State Board's electronic SMARTS database, lists the Facility's coverage under the Storm Water Permit as "Active" with a current Facility Waste Discharge Identification ("WDID") number of 8 30I002062.

100.   The NOI lists the SIC code for the Facility as 2951 (Asphalt Paving Mixtures and Blocks).

101.   SIC code 2951 facilities must obtain Storm Water Permit coverage for the entire facility. *See* Storm Water Permit, Section XVII.E.1.

102.   Plaintiff is informed and believes, and thereon alleges, that based on information available to Plaintiff, including the Facility's website and SWPPP, additional SIC codes, including 3273 (Ready-Mixed Concrete), 1442 (Construction Sand and Gravel), and/or 4212 (Local Trucking Without Storage), may also apply to the Facility.

103.   Plaintiff is informed and believes, and thereon alleges, that Facility is a participant in the Building Materials Industry (BMI) Compliance Group #244.

**B.   Industrial Activities and Pollutant Sources at the Facility.**

104.   Plaintiff is informed and believes, and thereon alleges, that the Facility is an asphalt batch plant and broken concrete and asphalt recycling facility that receives and processes sands and gravels.

105.   Plaintiff is informed and believes, and thereon alleges, that the Facility also includes a maintenance facility, vehicle and equipment repair, gasoline and diesel fueling, equipment storage, and a scale house.

106.   Plaintiff is informed and believes, and thereon alleges, that the Facility is immediately adjacent to the Santa Ana River and is directly exposed to precipitation and storm water runoff.

107.   Plaintiff is informed and believes, and thereon alleges, the Facility's primary industrial operations and necessary supporting facilities include: asphalt blending and

batching; aggregate, RAP and broken concrete storage; truck loading/unloading of goods; truck maintenance; asphalt oil storage tanks; aggregate processing areas; truck spray down area; underground fueling storage tank and fueling area; hazardous materials storage and disposal; high pressure wash area; gear boxes/chain drives; air compressors; bone yard; small portable construction equipment; equipment parking and storage areas; facilities maintenance; and municipal dumpster.

108.    Plaintiff is informed and believes, and thereon alleges, that the areas of industrial activity and industrial activities at the Facility are sources of pollutants.

109.    Plaintiff is informed and believes, and thereon alleges that pollutants associated with the areas of industrial activity and the industrial activities at the Facility include, but are not limited to: pH-affecting substances, heavy metals including aluminum, iron, petroleum hydrocarbons, sulfuric acid, lubricants, lead, oil and grease, erodible surfaces, antifreeze, solvents, paint, soaps, sediment, and organic materials.

110.    Plaintiff is informed and believes, and thereon alleges, that pollutants have been and continue to be tracked throughout the Facility by vehicles and machinery, and that these pollutants are tracked outside of the Facility and accumulate on the driveway, sidewalk, and street outside of the Facility.

111.    Plaintiff is informed and believes, and thereon alleges, that industrial materials and equipment are stored outdoors without adequate cover or containment, resulting in discharges of polluted storm water and prohibited non-storm water.

112.    Plaintiff is informed and believes, and thereon alleges, that hazardous materials associated with the industrial activities are stored outside without secondary containment or other measures to prevent polluted storm water and prohibited non-storm water from discharging from the Facility, and that these activities are all significant pollutant sources at the Facility.

113.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have not properly developed and/or implemented the required BMPs to address the pollutant sources and associated pollutants at the Facility.

114.   Plaintiff is informed and believes, and thereon alleges, that BMPs are necessary at the Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water from the Facility during rain events.

115.   Plaintiff is informed and believes, and thereon alleges, that as a result of the Facility Owners' and/or Operators' failure to develop and/or implement adequate BMPs, during rain events, storm water carries pollutants from the Facility's asphalt plant area(s), plant cold feed system(s), aggregate processing area(s), hazardous material storage and handling area(s), facilities maintenance area(s), equipment parking or storage area(s), boneyard area(s), asphalt plant staging area(s), fueling area(s), office building area(s), and other areas into the storm sewer system, which flows into the Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

116.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners' and/or Operators' failure to develop and/or implement adequate BMPs also result in prohibited discharges of non-storm water in violation of the Storm Water Permit and the Clean Water Act.

117.   Plaintiff is informed and believes, and thereon alleges, that these illegal discharges of polluted storm water and prohibited non-storm water negatively impact Plaintiff's members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters and by posing risks to human health and aquatic life.

118.   Plaintiff is informed and believes, and thereon alleges, that the industrial activities and areas at the Facility include, but are not limited to, the activities and areas described in paragraphs 104-107.

119.   Plaintiff is informed and believes, and thereon alleges, that the industrial activities and areas of industrial activity are sources of pollutants at the Facility.

## C.   The Facility's Discharge Locations.

120.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP is inconsistent about the number of discharge locations on-site, reporting just "one discharge location(s)" in some sections and describing two discharge locations in others:

Outfall 1 located at the "Front Entrance/Exit of Asphalt Plant" and Outfall 2 located at "Haul Road Exit" and "drain[ing] directly to the Santa [Ana] River."

121.   Plaintiff is informed and believes, and thereon alleges, that the Facility's Annual Reports certify there are two storm water discharge locations on site.

122.   Plaintiff is informed and believes, and thereon alleges, that while Section 2.1.4 of the Facility's SWPPP claims "water will only enter the Outfall [2] under extreme surface drainage conditions," Plaintiff's staff have observed and sampled discharge from Outfall 2 on multiple occasions. Plaintiff's staff have also observed contained storm water being discharged from the Facility directly into the Santa Ana River.

**D.   Unauthorized Non-Storm Water Discharges from the Facility in Violation of Storm Water Permit Discharge Prohibitions.**

123.   Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

124.   Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges occur at the Facility when high-pressure washing and/or tracking activities occur, and that the Defendants conduct these activities without adequate BMPs to prevent related non-storm water discharges.

125.   Plaintiff is informed and believes, and thereon alleges, that non-storm water discharges resulting from washing and/or tracking activities are not from sources listed among authorized non-storm water discharges in Special Conditions D(1) of the Storm Water Permit and, thus, are always prohibited under the Storm Water Permit.

126.   Plaintiff is informed and believes, and thereon alleges, that the Storm Water Permit Discharge Prohibitions are violated each time non-storm water is discharged from the Facility, and that these discharge violations are ongoing and will continue until the Defendants develop and implement BMPs that prevent prohibited non-storm water discharges or obtain separate NPDES permit coverage. *See* Storm Water Permit, Discharge Prohibition III.B.

**E.    Defendants' Violations of the Storm Water Permit's Effluent Limitations.**

127.    Plaintiff is informed and believes, and thereon alleges, that BMPs that achieve BAT/BCT have not been implemented at the Facility.

128.    Plaintiff is informed and believes, and thereon alleges, that storm water discharges from the Facility contain concentrations of pollutants associated with the Facility's industrial activities above benchmark levels established by the EPA and incorporated into the Storm Water Permit.

129.    Plaintiff is informed and believes, and thereon alleges, that storm water discharges from the Facility contain concentrations of pollutants with exceedances of NALs for aluminum, iron, TSS, N+N, and COD.  *See* Notice Letter, Exhibit 1.

130.    Plaintiff is informed and believes, and thereon alleges, that the ongoing exceedances of NALs demonstrate that Defendants have failed and continue to fail to develop and/or implement BMPs at the Facility as required to achieve compliance with the BAT/BCT standards.

131.    Plaintiff is informed and believes, and thereon alleges, that the Storm Water Permit Effluent Limitations are violated each time storm water discharges from the Facility, and that these discharge violations are ongoing and will continue every time the Defendants discharge polluted storm water from the Facility without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

**F.    Defendants' Violations of the Storm Water Permit's SWPPP Requirements.**

132.    The Facility's SWPPP is publicly available via the SMARTS database and is dated June 25, 2015, reportedly amended on November 14, 2016 and August 30, 2017.

133.    Plaintiff is informed and believes, and thereon alleges, that the SWPPP referenced in paragraph 132 is the current SWPPP for the Facility.

134.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have conducted and continue to conduct operations at the

Facility with an inadequately developed, implemented, and/or improperly revised SWPPP.

135.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP is out of compliance with: (1) the Site Map, (2) Potential Pollutant Sources, (3) BMPs, and (4) Monitoring Implementation Plant Permit requirements.

136.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP also fails to accurately identify other required information such as the Facility's Duly Authorized Representative and operating hours.

137.   Plaintiff is informed and believes, and thereon alleges, that the Facility's Site Map included in the SWPPP has not been updated since 2015 and is out of compliance with the Storm Water Permit.

138.   Plaintiff is informed and believes, and thereon alleges, that there is no clearly delineated Facility boundary in the Site Map, and the Site Map appears to exclude the northernmost part of the Facility in violation of the Permit. *See* Storm Water Permit, Section X(E)(3)(a).

139.   Plaintiff is informed and believes, and thereon alleges, that the Site Map fails to correctly and/or clearly depict sampling locations as it only labels Outfall 1, not Outfall 2 where Plaintiff's staff have observed discharge and collected samples on multiple occasions. *See* Storm Water Permit, Section X(E)(3)(b).

140.   Plaintiff is informed and believes, and thereon alleges, that the Site Map does not clearly delineate between impervious areas of the Facility and parts of the Facility featuring industrial materials directly exposed to precipitation. *See* Storm Water Permit, Section X(E)(3)(d)-(e).

141.   Plaintiff is informed and believes, and thereon alleges, that the Site Map does not clearly specify the location of fueling stations, equipment storage, maintenance areas, and/or other areas of industrial activity with potential pollutant sources. *See* Storm Water Permit, Section X(E)(3)(d)-(f).

142.   Plaintiff is informed and believes, and thereon alleges, that the Site Map fails

to depict all required structural control measures and/or BMPs, including, but not limited to, infiltration wells in the driveways along Lincoln Avenue. *See* Storm Water Permit, Section X(E)(3).

143.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP fails to include an adequate pollutant source assessment.  *See* Storm Water Permit, Section X(G)(2).

144.   Plaintiff is informed and believes, and thereon alleges, that, on August 24, 2017, a Regional Board representative noted via email that the Facility's SWPPP was outdated and "needs to include the new BMPs implemented on the site" and that the Site Map was outdated needed to be updated to "include the new BMPs implemented on the site." Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to update its SWPPP and Site Map in accordance with this request.

145.   Plaintiff is informed and believes, and thereon alleges, that the BMPs in the Facility's SWPPP are outdated.

146.   Plaintiff is informed and believes, and thereon alleges, that notwithstanding the specific demand referenced in paragraph 144 above and the Facility's Level 1 ERA report, the BMP section of the SWPPP has not been updated since the Facility's initial SWPPP filing in 2015.

147.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP and Amendment Log erroneously states that the original SWPPP was amended on November 14, 2016 to reflect additional BMPs, including Advanced BMPs. Plaintiff is informed and believes, and thereon alleges, that the only amendment uploaded by the Facility was an amendment dated August 30, 2017, which modified the Stormwater Team.

148.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP fails to include Permit requirements for BMPs to prevent non-storm water discharges.

149.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to consider aluminum in its SWPPP, which was detected in concentrations above NALs in Plaintiff's samples. *See* Exhibit 1 to Notice Letter.

150.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to adequately develop, implement, and/or revise the SWPPP in violation of the Storm Water Permit's SWPPP requirements.

151.   Plaintiff is informed and believes, and thereon alleges, that Defendants have been in daily and continuous violation of the Storm Water Permit's SWPPP requirements since at least May 20, 2016.

### G.   Defendants' Violations of the Storm Water Permit's Monitoring Implementation Plan Requirements.

152.   The Facility's SWPPP section entitled: "Monitoring Implementation Plan" discusses the Facility's MIP.

153.   Plaintiff is informed and believes, and thereon alleges, that Defendants have been conducting, and continues to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP.

154.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to collect storm water discharge samples as required pursuant to Section XI(B)(3) of the Storm Water Permit, which requires Compliance Group Participants to collect and analyze storm water samples from one QSE within the first half of each reporting year and one QSE within the second half of each reporting year.

155.   Plaintiff is informed and believes, and thereon alleges, that since obtaining coverage under the Storm Water Permit in 2015, the Facility has reported just one sample in total.

156.   Plaintiff is informed and believes, and thereon alleges, that the Facility's lone sample was collected on January 5, 2016 and reports results for O&G, TSS, iron, and N+N from Outfall 1 only.   Plaintiff is informed and believes, and thereon alleges, that Defendants have never reported samples from Outfall 2.

157.   Plaintiff is informed and believes, and thereon alleges, the Facility has failed to collect a single sample since January 5, 2016, claiming in each subsequent Annual

Report that no qualifying discharge/sampling events occurred.

158.   Plaintiff is informed and believes, and thereon alleges, that notwithstanding the Facility's Annual Report certifications, Plaintiff's staff successfully collected storm water samples from the Facility on February 14, 2019, December 28, 2020, and March 10, 2021.

159.   On each of the dates set forth in paragraph 158 above, Plaintiff's staff (i) observed employees present at the Facility, (ii) observed that the business appeared to be operating, and (iii) observed and collected samples from both Outfalls 1 and 2, as well as from contained storm water being pumped out of the Facility.

160.   Plaintiff's sampling results indicated NAL exceedances for iron, TSS, N+N, aluminum, and COD. *See* Notice Letter, Exhibit 1.

161.   Plaintiff is informed and believes, and thereon alleges, that Defendants have never reported samples for pH, aluminum, or COD.

162.   Plaintiff is informed and believes, and thereon alleges, that Plaintiff's sampling results indicate Defendants are not sampling for all pollutants present in the Facility's discharge in violation of the Permit. *See* Storm Water Permit, Sections X(G)(2) and XI(B)(6)(c).

163.   Plaintiff is informed and believes, and thereon alleges, that additional SIC codes apply to the Facility, and Defendants are not sampling for all pollutants required pursuant to Section XI(B)(6)(d) of the Permit.

164.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to collect storm water discharge samples as required by the permit.

165.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to conduct monthly dry weather visual observations and/or keep and maintain records of such observations in violation of Section XI(A) of the Storm Water Permit.

166.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to conduct and/or document discharge visual observations from each discharge

location and/or keep and maintain records of such observations as required by Section XI(A) of the Storm Water Permit.

167.   Plaintiff is informed and believes, and thereon alleges, that Defendants have been in daily and continuous violation of the Storm Water Permit MIP requirements since at least May 20, 2016.

**H.    Defendants' Violations of the Storm Water Permit's Exceedance Response Requirements.**

168.   Plaintiff is informed and believes, and thereon alleges, that based on sample results submitted by the Facility Owners and/or Operators, the Facility triggered Level 1 status during the 2015-2016 reporting year for iron and TSS.

169.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators were required to (i) complete a Level 1 ERA Evaluation by October 1, 2016, (ii) prepare and submit a Level 1 ERA Report to SMARTS by January 1, 2017, and (iii) amend the SWPPP accordingly with revisions uploaded to SMARTS by January 1, 2017.

170.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to upload SWPPP revisions until September 6, 2017.

171.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP revisions referenced in paragraph 170 were submitted late and out of compliance with the Storm Water Permit.

172.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP revisions referenced in paragraph 170 were inadequate as they solely updated the Stormwater Team members and failed to update BMPs as required by the Storm Water Permit. *See* Permit, Section XII(C).

173.   Plaintiff is informed and believes, and thereon alleges, that the Facility's Compliance Group Leader submitted a Compliance Group-wide Level 1 ERA Report and Evaluation on November 30, 2016.

174.   Plaintiff is informed and believes, and thereon alleges, that the Level 1 ERA

Report was deficient and the Facility Owners and/or Operators have failed to take appropriate corrective measures.

175.   Plaintiff is informed and believes, and thereon alleges, that the Level 1 ERA Report concludes "the [iron] NAL exceedance is only attributed to Drainage Area 1" and the "primary BMP for TSS at this facility is discharge prevention."

176.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators (i) have failed to submit a single storm water sample since the 2015-2016 reporting year and (ii) have never submitted sample results for Outfall 2, which drains Drainage Area 3.

177.   Plaintiff's samples indicate regular discharges with continued exceedances of iron and TSS, as well as additional exceedances of N+N, aluminum, and COD from Outfall 2, where Plaintiff's representatives observed water being pumped out of the Facility directly into the Santa Ana River during operating hours and while employees were present onsite.

178.   Plaintiff is informed and believes, and thereon alleges, that Plaintiff's samples undermine the Level 1 ERA Report's conclusions and indicate the Facility's failure to comply with the storm Water Permit's requirements for utilizing an iterative process to determine and improve BMPs.

179.   Plaintiff is informed and believes, and thereon alleges, that Plaintiff's samples further suggest the Facility would have entered Level 2 status for iron and TSS and/or at least Level 1 status for additional parameters had the Facility Owners and/or Operators been sampling in accordance with Permit requirements.

180.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to take Exceedance Response Actions as required by Section XII of the Permit.

181.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit Exceedance Response Actions requirements since at least May 20, 2016.

I.   **Defendants' Failure To Comply With The Storm Water Permit's Reporting Requirements.**

182.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to submit Annual Reports that comply with the Storm Water Permit's reporting requirements.

183.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to submit its 2015-2016 Annual Report until December 19, 2016 – five months past the Permit deadline. *See* Storm Water Permit, Section XVI(A).

184.   Plaintiff is informed and believes, and thereon alleges, that the Facility's Annual Reports contain unsatisfactory and/or untrue explanations for why the Facility failed to sample and/or conduct sampling event visual observations as required by the Permit.

185.   Plaintiff is informed and believes, and thereon alleges, that the 2015-2016 Annual Report certified the Facility was unable to sample the required number of QSEs because the Facility "[w]as only able to obtain 1 sample from outfall #1.  Outfall #2 had no discharge events."

186.   Plaintiff is informed and believes, and thereon alleges, that the 2016-2017 Annual Report certified the Facility was unable to sample the required number of QSEs because there was "[n]o discharge from site."

187.   Plaintiff is informed and believes, and thereon alleges, that the 2017-2018 Annual Report attributed the lack of samples to "no qualifying storm water discharges occur[ing] during scheduled facility operating hours."

188.   Plaintiff is informed and believes, and thereon alleges, that each of the 2018-2019 and 2019-2020 Annual Reports certified there were "[n]o qualifying sampling events."

189.   Plaintiff is informed and believes, and thereon alleges, that the 2020-2021 Annual Report certified there was "[n]o discharge present during industrial operations operating hours or inspections" yet that contained storm water was discharged due to the

"[e]mergency system activated outside industrial operations operating hours."

190.   Plaintiff is informed and believes, and thereon alleges, that the statements in each of the Annual Reports discussed in paragraphs 185-189 above contradict both National Oceanic Atmospheric Administration ("NOAA") rain data and Plaintiff's observations and sampling, which reveal there were QSEs when Defendants certified there were not. *See*, e.g., Notice Letter, Exhibit 1 (setting forth dates Plaintiff sampled the Facility) and Exhibit 2 (setting forth dates of significant rain events near the Facility).

191.   Dates of significant rain events are measured at the Anaheim, CA US USC00040192 station located near the intersection of N. Tustin Ave and Miraloma Ave, based on data recorded by NOAA. A significant rain event is defined by EPA as a rainfall event generating 0.1 inches or more of rainfall, which generally results in discharges at a typical industrial facility. As measured by this rain gauge, Plaintiff is informed and believes, and thereon alleges, there were a total of 114 significant rain events from July 1, 2015 to June 30, 2020.

192.   Plaintiff is informed and believes, and thereon alleges, that while (i) each of the Facility's Annual Reports prior to the 2020-2021 reporting year certified no contained storm water was discharged from the Facility and (ii) the Facility's 2020-2021 Annual Report certified contained storm water was discharged from the Facility only due to an "[e]mergency system activated outside industrial operations operating hours," as noted in paragraph 177 above, Plaintiff's representatives recently observed storm water being collected and pumped out of the Facility during operating hours and while employees were present onsite.

193.   As noted in paragraphs 165-166 above, Plaintiff is informed and believes, and thereon alleges, that, the Facility is not conducting monthly visual observations as required by the Storm Water Permit.

194.   Plaintiff is informed and believes, and thereon alleges, that in each of its 2015-2016, 2016-2017, 2017-2018, 2018-2019, 2019-2020, and 2020-2021 Annual Reports, the Facility erroneously certified that it conducted monthly visual observations

1  in accordance with Storm Water Permit.

2      195.   Plaintiff is informed and believes, and thereon alleges, that despite the

3  deficiencies noted above, the Facility Owners and/or Operators erroneously certified all

4  information submitted in each annual report was true and correct.

5      196.   Plaintiff is informed and believes, and thereon alleges, that because the

6  Facility Owners and/or Operators have submitted incomplete, incorrect, and/or untimely

7  Annual Reports that fail to comply with the Storm Water Permit, the Facility Owners

8  and/or Operators are in daily violation of the Storm Water Permit.

9      197.   Plaintiff is informed and believes, and thereon alleges, that the Facility

10  Owners and/or Operators have been in daily and continuous violation of the Storm Water

11  Permit's reporting requirements every day since at least May 20, 2016.

12

13  **VI.     CLAIMS FOR RELIEF**

14  **FIRST CAUSE OF ACTION**

15  **Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated**

16  **Storm Water in Violation of the Storm Water Permit's Effluent Limitations.**

17  **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

18      198.   Plaintiff incorporates the allegations contained in the above paragraphs as

19  though fully set forth herein.

20      199.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed

21  and continue to fail to reduce or prevent pollutants associated with industrial activities at

22  the Facility from discharging from the Facility through implementation of BMPs that

23  achieve BAT/BCT.

24      200.   Defendants' failure to develop and/or implement BMPs that achieve the

25  pollutant discharge reductions attainable via BAT or BCT at the Facility is a daily

26  violation of the Storm Water Permit and the CWA. Storm Water Permit, Section I(D)

27  (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

28      201.   Defendants have violated, are violating, and will continue to violate the

Storm Water Permit Effluent Limitations each day that the Facility is not implementing BMPs that achieve BAT/BCT standards for discharges of pollutants to waters of the United States from the Facility.

202.   Plaintiff is informed and believes, and thereon alleges, that Defendants violated the Effluent Limitations of the Storm Water Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

203.   Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

204.   Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

205.   Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

206.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 20, 2016 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

207.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

208.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

209.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

210.   Plaintiff is informed and believes, and thereon alleges, that within the applicable statute of limitations, Defendants have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

211.   Plaintiff is informed and believes, and thereon alleges, that within the applicable statute of limitations, Defendants have failed and continue to fail to adequately implement the SWPPP for the Facility, in violation of the Storm Water Permit.

212.   Plaintiff is informed and believes, and thereon alleges, that within the applicable statute of limitations, Defendants have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

213.   Defendants have been in violation of the Storm Water Permit at the Facility every day from May 20, 2016, to the present.

214.   Defendants' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

215.   Defendants will continue to be in violation of the Storm Water Permit and the CWA each and every day Defendants fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

216.   Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

217.   Plaintiff alleges that its members have been harmed by Defendants' acts and

omissions described herein and have standing to bring this suit.

218.   Each and every violation of the Storm Water Permit SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

219.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 20, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

220.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

221.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against the Defendants as set forth hereafter.

## THIRD CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Program in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

222.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

223.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

224.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to adequately implement the MIP for the Facility, in violation of the Storm Water Permit.

225.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to adequately revise the MIP for the Facility, in violation of the Storm Water Permit.

226.   Defendants have been in violation of the Storm Water Permit monitoring requirements at the Facility every day from May 20, 2016 to the present.

227.   Defendants' violations of the Storm Water Permit monitoring requirements and the CWA at the Facility are ongoing and continuous.

228.   The Facility Owners and/or Operators will continue to be in violation of Section XI of the Storm Water Permit and the CWA each and every day they fail to adequately develop, implement, and/or revise the MIP for the Facility.

229.   Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

230.   Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

231.   Each and every violation of the Storm Water Permit MIP requirements at the Facility is a separate and distinct violation of the CWA.

232.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 20, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

233.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

234.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against the Defendants as set forth hereafter.

### <u>FOURTH CAUSE OF ACTION</u>

**Defendants' Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

235.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

236.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that the Defendants' 2015-2016 Annual Report fails to meet the requirements of Section XVI(B) of the Storm Water Permit.

237.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that the Defendants' 2016-2017 Annual Report fails to meet the requirements of Section XVI(B) of the Storm Water Permit.

238.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that the Defendants' 2017-2018 Annual Report fails to meet the requirements of Section XVI(B) of the Storm Water Permit.

239.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that the Defendants' 2018-2019 Annual Report fails to meet the requirements of Section XVI(B) of the Storm Water Permit.

240.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that the Defendants' 2019-2020 Annual Report fails to meet the requirements of Section XVI(B) of the Storm Water Permit.

241.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that the Defendants' 2020-2021 Annual Report fails to meet the requirements of Section XVI(B) of the Storm Water Permit.

242.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants failed to submit an adequate Level 1 ERA Report

for iron in accordance with Section XII(C) of the Storm Water Permit.

243. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants failed to submit a Level 1 ERA Report for TSS in accordance with Section XII(C) of the Storm Water Permit.

244. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants failed to submit a Level 1 ERA Report in accordance Section XII(C) of the Storm Water Permit for additional parameters the Facility would have triggered Level 1 ERA status for if the Facility had been sampling in accordance with Permit sampling requirements.

245. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants failed to submit a Level 2 ERA Action Plan in accordance with Section XII(D) of the Storm Water Permit for iron, TSS, and additional parameters the Facility would have triggered Level 2 ERA status for if the Facility had been sampling in accordance with Permit sampling requirements.

246. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants failed to submit a Level 2 ERA Technical Report in accordance with Section XII(D) of the Storm Water Permit for iron, TSS, and additional parameters the Facility would have triggered Level 2 ERA status for if the Facility had been sampling in accordance with Permit sampling requirements.

247. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants failed to collect and report samples from all discharge locations in accordance with Section XI(B) of the Storm Water Permit since at least May 20, 2016.

248. Defendants have been in violation of Sections XI, XII, and XVI of the Storm Water Permit and the CWA every day since at least May 20, 2016.

249. Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to

waters of the United States.

250.   Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

251.   Defendants' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

252.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 20, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

253.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

254.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays judgment against the Defendants as set forth hereafter.

## FIFTH CAUSE OF ACTION

**Violation of Section 301(a) of the Clean Water Act by Unauthorized Non-Storm Water Discharges from the Facility in Violation of Storm Water Permit Discharge Prohibitions**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

255.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

256.   Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

257.   Defendants have violated, are violating, and will continue to violate the Storm

Water Permit Discharge Prohibitions each time non-storm water is discharged from the Facility.

258.   Plaintiff is informed and believes, and thereon alleges, that Defendants violated the Discharge Prohibitions of the Storm Water Permit and the Clean Water Act within the applicable statute of limitations, and that such violations are ongoing and continuous.

259.   Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

260.   Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

261.   Each and every violation of the Storm Water Permit Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

262.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 20, 2016 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

263.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

264.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## VII.    RELIEF REQUESTED

265.    Plaintiff respectfully requests that this Court grant the following relief:

a.    A Court order declaring the Defendants to have violated and in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to develop and implement an adequate SWPPP, for failing to submit accurate annual reports, for failing to timely submit sufficient ERA reports, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit;

b.    A Court order enjoining Defendants from discharging pollutants in violation of an NPDES permit;

c.    A Court order requiring Defendants to implement affirmative injunctive measures designed to eliminate Defendants' violations of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

d.    A Court order assessing civil monetary penalties for each violation of the CWA at $56,460 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after December 23, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

e.    A Court order awarding Plaintiff its reasonable costs of suit, including attorneys', witness, experts', and consultants' fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.    Any other relief as this Court may deem appropriate.


Dated: July 19, 2021                      Respectfully submitted,

By /s/ Sarah J. Spinuzzi
Sarah J. Spinuzzi
Attorney for Plaintiff
Orange County Coastkeeper